Thank you, Mr. Kane. The court is pleased to hear one argument this morning. Chin versus Vertex, appellate number 23-1031. We heard from counsel for the appellate. Good morning. May it please the court. My name is Ian Bryson. I'm an attorney with the Derek Smith Law Group, appearing on behalf of Mr. Ching Chin. I'd like to reserve two minutes for rebuttal. That'll be granted. So I want to talk about the case in a nutshell. First, the discrimination claim, and then I'll get to the retaliation and hostile work environment. The discrimination claim, we have two key points. We have, number one, a complete evidence chain linking the discriminatory remarks of Mr. Hart to the two adverse employment actions of promotion, denial, and termination. We also have comparators who were treated more favorably than Mr. Chin, who are not Chinese, and that's Fred Yahweh, who's in the architecture group, and the other architects in the group, all of whom were given promotions within a few years, and Mr. Chin was denied promotions over approximately a 20-year career. How do you rebut the presumption, for the legitimate reason that was proffered, considering the following? There was a change in the evaluation or management model, a long record of comments to your client about the fact that the projects he was working on were not generating the concrete contributions to the organization and the failure to meet the PIP. How do you rebut those reasons for the decision not to promote and the termination? Sure. So I think the legitimate non-discriminatory reason was that Mr. Chin was not engaged, and so there's no contemporaneous evidence from the time that Mr. Chin was working there to show that he was not engaged. For example, the information that the appellee cites to are post hoc statements by Ms. Kurtz, Mr. Stahlheber, and Mr. Harder, and Ms. Falco as well, which were all after Mr. Chin was already fired, or actually more than a year after Mr. Chin was terminated. Ms. Falco, who made one of the statements, is in HR. She has no knowledge of Mr. Chin's work. She never even said contemporaneously that he was not engaged. Mr. Stahlheber, another one, he was Mr. Chin's manager during the PIP. The district court completely ignored the fact that Mr. Chin was engaged, and one of the examples of that was Mr. Chin was working on the excise project all the way up until the date of his termination, and he had informed Mr. Stahlheber in weekly calls and status emails that he was working on the excise project, and the district court completely disregarded that. Ms. Kurtz, another one of the individuals who made a declaration, who was one of the four reviewers, never said during the time that Mr. Chin was not engaged. In fact, in her interview, she recommended Mr. Chin's good work to be extended into the following year. When you go back to prior to 2018, obviously all this came to the fore in 2018 and 2019. When you go back to the beginning of 2014, Rick Harder was asked information about promotion opportunities, and he responded, we need to get you more involved in opportunities when your idea can be implemented. In May of 2016, Mr. Chin's sponsor, Ed Reed, encouraged him to get more involved in formal teams at Vertex. In June 8th of 2017, Mr. Chin accepts an invitation from Mr. Harder to recline ways to contribute more. August 24th, 2017, Mr. Chin emailed Mr. Harder asking a time code to use on exploratory efforts, and Harder responds, let's get more activities that can connect you to current Vertex efforts. It appears over the course of time there was some concern that there was a lack of engagement, a lack of involvement, that up to that point in time hindered promotion opportunities for Mr. Chin. So it's hard to say that there wasn't a concern expressed even before 2018. What would be your response to that? Prior to 2018, Mr. Chin's reviews were glowing reviews. In fact, in 2018, Ed Reed recommended Mr. Chin for promotion, and Mr. Harder also stated that Mr. Chin's workload certainly reflects senior-level workload and that his, you know, he's, the promotion is, seems like it's dill at this time. The other lack of engagement kind of verbiage that were pulled out of emails, it's all picked out of these emails, anything prior to that, and the idea that he worked on the PAM library and that was the only thing that he had worked on in 2018 is false. He stopped working on the PAM library in 2017, and so in 2018 he was engaged and he was working on the excise project and the Q2O project. Is this for us to decide at this stage? I mean, the district court basically said he can't get past the prima facie case, so isn't this assessment of pretext and legitimacy, etc., something that needs to be weighed by a jury and something that needs to be examined in the first instance by a jury? Assume if we were to find that the district court was wrong and that, you know, under the timing plus and retaliation and the prima facie case for the two remarks that he made, the question about his being Chinese and then the March 31st complaint, that they are protected activity, isn't this something that has to be weighed when it goes back to the district court to be assessed by a jury? Yes, yes, and there are clearly genuine issues in material fact with respect to the prima facie case, and we presented significant evidence to show that a reasonable jury can be persuaded that the reasons that they gave for Mr. Chen's termination were pretext. Well, that's it. I think only if we could say that there's no way that a jury could find these to be pretextual would we basically address that aspect of the case at this point, isn't that correct? Yes, that's correct. In other words, you're doing the McDonnell-Douglas analysis. You have to show that there's a prima facie case. Once you do that, they have to show what their reasons were. Then you have to come back and show that it's pretextual. So rather than starting at the end, I think what Judge Mandela is saying, let's go back to the beginning. What is your prima facie case? Prima facie case for the discrimination claim and the retaliation claim is essentially Mr. Chen's Chinese. For the discrimination claim, he suffered two adverse employment actions. Number one, he was denied a promotion in 2018, and number two, he was fired. Okay, we have causation linking the two, and the way that we have causation is, first, we know that Mr. Chen was given a review based on his Chinese nationality. Mr. Hart gave a review based on stereotypical generalizations of a Chinese person. We know that that caused Mr. Chen to have a poor rating. The review is part of his official record in 2018. I see that I'm running out of time, actually. Please answer Judge Amber's question, then I'll ask the panel if they have other questions for you on all three issues. Okay. And then I'll turn it over to my colleagues. All right, so he has the racially motivated review. The review causes the poor rating. Vertex says Mr. Hart has testified in his deposition that he used the review in the rating decision. The poor rating thereby causes the loss of promotion. Ms. Kurtz says that the poor rating leaded to the denial of the promotion. The poor rating also caused the PIP. Mr. Stahlheber says that Vertex chose to put Mr. Chen on the PIP because of the poor rating, and then the PIP was fake. The PIP was that there were barriers to succeed on the PIP. There were no decision makers to agree to assign Mr. Chen to any of the projects that he was supposed to succeed on in the PIP. Vertex knew it, and they didn't remove any of the barriers, guaranteeing his failure of the PIP. And then the PIP, due to him being deemed to have failed the PIP, he's therefore fired. So there's a clear evidence chain linking the race and nationality to the decision to fire Mr. Chen. I'm sorry. Go ahead, Judge Rendell. How about the district court's view that the timing here was not sufficiently sufficient for causation? Sure. So we have two timelines. The first starts in October. It's approximately late October of 2018 when Mr. Chen goes to his office. I believe my Chinese nationality is the reason I haven't been promoted. The way that he phrases it is, am I not being promoted because I'm Chinese? Mr. Harder says, that's a question for HR. You need to go to HR with that question. On December 13th, my client goes to HR, Andrea Falco, because there's no clear procedures at Vertex for how to report discrimination. So he necessarily has to reach out to HR to say, how do I report this? That's December 13th. The very next day, December 14th, Mr. Harder sends an email to the other decision maker saying, I'm starting to rethink, Mr. Chen, my decision to promote Chen, because some issues have came up in his review, minor though they are. And so we have clear temporal proximity between the October and Harder and to Ms. Falco, and then the decision to retract the promotion on December 14th. And then on February 8th is when he actually gets the poor rating. And this is all part of the same procedure, the same evaluation process in 2018. So even though the decisions seem to be weeks apart, they're all part of the same mechanical process. The calibration process at Vertex had basically. Yes. And the court ignored that that was sort of one process and it seemed to just separate everything without recognizing. You focused on the first comment by Mr. Chen to Harder about, and this was a roughly October of 2018, about whether he wasn't getting promoted because of his ethnic background. But in fact, Mr. Harder recommended a promotion for him. So doesn't that break the chain of causation as to that act? No, because once Mr. Harder was informed that Mr. Chen believed his race was the reason for the not promotion, the following day, he sends an email to the calibration team, letting them know that he's rethinking the decision. That's December, isn't it? That's not October. In October, he goes and asks the question. You're right. In November-ish, he gets the promotion. So in that period, we have a break of causation. So we have testimony from Ms. Falco that she talked to Mr. Harder about the fact that. But that was in December. I'm trying to just keep the chronology. My understanding from the record is he makes the comment to Mr. Harder in October. Harder gives him a strong contributor evaluation in November and recommends him for a promotion. It's after that, in December, as I understand the chronology, that the plaintiff meets with Human Resources for the first time and asks for more guidance concerning reporting discrimination, although doesn't make a direct report there. And Ms. Falco doesn't know anything about. Mr. Harder doesn't know or Ms. Kurtz doesn't know that he went there to make that inquiry. So I hear you on these events, but aren't each of them broken by an event in between? And I'll just finish my chronology with you so you can respond. And then when he comments that he believes his review had racially discriminatory content, that it resulted in the PIP is what he's saying. But the PIP was discussed before he even made that comment about his concerns about motivation. So it just seems like there are events that seem to keep breaking the chain on the retaliation point, assuming all of it is protected activity. All right. Regarding the decision of Mr. Harder to recommend Mr. Chin for promotion, over 14 years, Mr. Chin is asking Mr. Harder and his managers to be promoted. And for 14 years, Mr. Harder is always positive but dismissive of Mr. Chin. He repeatedly tells him, you're next in line, just wait for the budget, wait for management approval. Meanwhile, all the other non-Chinese individuals are being promoted within a specific timeframe. Mr. Harder's, I guess, decision to recommend Mr. Chin for promotion was only an it wasn't like he actually did it. He said he was going to do it. And then he ultimately determined that he wasn't going to do it after Mr. Chin, number one, he asked him about Chinese nationality being the reason for the non-promotion. And number two, after he went to HR and began discussing with them the procedures for complaining. Ms. Falco did talk to Mr. Harder after Mr. Chin went to her office to discuss the reporting procedures. So he knew about that when he decided not to promote Mr. Chin. Over the course, go ahead, Fisher, I'm sorry. That's all right. I had two questions. You've twice made comments concerning the promotion of individuals who are not Chinese. Where is that in the record that there were promotions of those of different ethnic backgrounds? Is there a speculation from your adversary? Is there something in the record that would tell us the ethnic backgrounds of those who were promoted at times when your client was not? It's in the record. I want to say it's an interrogatory answer. It's somewhere in the record. We asked them for that and we were provided that information. I believe I had even asked Mr. Harder and Mr. Stahlheber in their deposition transcripts. It should be in there. We did confirm several times over that Mr. Chin was a Chinese individual in the architecture group. Thank you. Are you abandoning your theory of direct evidence as opposed to indirect evidence? You can hear the questions from the panel have been focusing on McDonald-Douglas and indirect evidence. Are you abandoning your direct evidence theory? No, I'm absolutely not abandoning the direct evidence theory. The direct evidence theory is the most convincing. It's Mr. Hard's comments. He said they were based on cultural differences. Mr. Chin asked him about the comments. I got it. I know what the base is. I just couldn't tell given the remarks you were making thus far. I just wanted to confirm so we're pursuing that theory. Judge Ambrose. In the 19 years that Mr. Chin was at Vertex, how many times prior to 2018 was he officially passed over? He was never given a decision on his permission request. He was only given a decision in 2018. Actually, he wasn't even given the decision in 2018. We found out in discovery that he wasn't the normal progression for someone hired in 2000 to be considered for promotion. It's four years, eight years. What was the company record in connection with that? It was eight years to the next step up. Then it was on average six years thereafter. Then you said that there were nine other persons of the same ethnicity that were promoted, but you say there were other areas of Vertex. Is that correct? I said that all the other members in the architecture group were promoted on average within eight years and then again within six. None of those other individuals are Chinese. There's approximately 14 of them. Okay. Every one of those 14 others of the 14 are in another section of Vertex. Is that correct? They're all in the same architecture group. They all report to Mr. Harder, and they were all subject to the same 2018 performance evaluation period. They're all in the same architectural group, but are there subsections that you say that are all 10 in the same section of the group? Yes. Okay. I thought I heard you say something differently, but they were. There were nine others who were- There's three titles. There's one group, they all report to the same person, but there's three levels. There's the entry level position that Mr. Chin was in, then there's senior architect, and then above that, there's principal architect. They're all within the same group. Okay. These others, the other eight were either senior or principals. That's correct. Okay. I have no further questions. Thank you. Judge Rendell, any further questions? No, I'm fine. Thank you. Okay. Counsel will have you back on rebuttal. Thank you. Thank you. We'll hear from the EEOC. Good morning, your honors. Georgina Yeomans for the EEOC. We weighed in to address primarily three legal issues that we viewed in the district court's decision, but if I may, I'd like to touch on some of the questions that have come up so far this morning, beginning with the question of how Mr. Chin can overcome Vertex's explanation for why they terminated him and took the other adverse actions against him. In addition to the fact that the evidence is not unambiguous, there's evidence showing that Mr. Chin did not have performance issues, including most poignantly the fact that his manager thought he was ready for a promotion in 2018, set goals for him to meet, and then acknowledged in December that he met all those goals. But in addition to all of that contrary evidence, which I think suggests this case should be decided by a jury, there comes the question of even taking Vertex at its word that Mr. Chin had these longstanding performance issues, why was it now that they took these adverse actions against him instead of sometime over the preceding years when he was supposedly underperforming? The Carvalho Grievous case that we cite in our brief raises the point that the plaintiff doesn't have to show that he would never have been fired, just that he wouldn't have been fired at this time in order to prevail on his retaliation claim, and I think the same goes for discrimination. And Judge Schwartz, you raised the point that there's evidence that Vertex was operating under a new evaluation system, but there's also evidence, there's an 113 of the appendix saying that this evaluation process is going to be largely the same as the year before. So that point itself is not undisputed in the record. Ms. Yeomans, we're a reviewing court, we're reviewing what the district court did. Could you be specific as to how the district court erred and what we need to do about it? Absolutely. As I mentioned, there are three main errors that we view that the district court made on the law, and then there's errors we view at the application of the summary judgment standard. I'll take them in reverse order from our brief. The first is the application of the McDonnell-Douglas test to Mr. Chin's disparate treatment claim. In our view, and I think in the view of this court and the Supreme Court, the district court applied an overly rigid sort of articulation of the McDonnell-Douglas test in evaluating Mr. Chin's failure to promote claim by asking whether Vertex had advertised the promoted to and asking whether somebody else was promoted over him. Instead of taking into account the context that Vertex, which is pretty unambiguous in the record, that it wasn't the case that Vertex advertised a senior architect position. It was the case that people earned that promotion based on their performance after a certain amount of time. So it's inappropriate to ask whether Vertex had advertised the promotion. Instead of looking to the totality of the discrimination was what was driving the adverse actions that Mr. Chin experienced. The second legal error that we view is the apparent bright line rule that the district court applied in evaluating timing in the context of causation in Mr. Chin's retaliation claim. The district court seems to have said that sort of as a bright line rule, two months is too long to raise an inference of a causal relationship between protected activity and an adverse action and even suggested that perhaps three weeks is too long. And this court has said over and over again that there's not a bright line rule in terms of how long is too long to raise an inference of causation. As far back as the Farrell versus Planters case in 2000, this court has said it's a context-driven inquiry. We look both to what the procedural posture of the case is, but also what the other rare cases summary judgment that timing is the only thing that would suggest causation. Although our court has said in Moody that after about three months, the time, the effect of the timing begins to dissipate. It doesn't go away, but it begins to weaken. Is there something wrong with that? It seems like that makes sense. After about three months, it just gradually can go away depending on the circumstances that you say. I agree, Judge Ambrose. That's what Moody says. And we haven't objected to that articulation of the law. In fact, we rely on it in our brief because all of the events that issue in this case can be connected by something shorter than three months and are also bolstered by other of a causal relationship. The point that we wanted to avoid was any sort of right-line rule that three weeks is too short, that two months is too short, something much more restricted than this court has indicated in its precedent. I know you want to make a third point, but it seems like what you're saying so far is that your quibbles are with what the district court did by being too rigid rather than what the circuit law is at this stage. Yes, exactly. That's exactly right. Okay. Thank you. Judge Beard, your third point. Okay. The third legal issue that we weighed in on is whether Mr. Chin's question in October of 2018 about not being promoted because he's Chinese, whether that was protected opposition context for the purposes of his retaliation claim. This court has said it's a highly fact-specific inquiry whether conduct counts as opposition conduct. We look to the message being conveyed rather than the conveyance. Here, Mr. Chin unambiguously connected an employment action, the failure to promote him to his national origin in a question to his manager about whether that was the barrier to him advancing in the workplace. We think a jury could certainly find that that is protected opposition conduct and the district court's dismissal of it as objectively just a question, not protected activity with error. Do we look at Harder's response to the question as well? Yes, you do, Judge Rendell. That is an important component, how the employer understood the communication and Mr. Harder's response, referring Mr. Chin to HR, certainly adds to the indication that this was protected conduct and that we're executed as such. I could ask you a question about the December 13 inquiry to Ms. Falco. We have not. Oh, sorry, go ahead. What is your position? Is that protected activity under the facts of this case, just the inquiry? Because I don't see any evidence that the recipient would know that that was opposing some discriminatory act. Can you help me with that? I don't think I can be very helpful to you with that. We didn't weigh in on whether that's protected activity, so we didn't take a position on it one way or another. Maybe Mr. Bryson would like to address that in his rebuttal time. What about, did you take a position on whether a reasonable jury can conclude that that plaintiff could prevail on a direct evidence theory? We did not take a position on that either. Judge Schwartz, if I may address your question about breaking the chain of causation between the October question and the December delay of the promotion. I think the overarching question is whether a jury would be precluded from finding that Mr. Harder acted in a retaliatory way. I think that the evidence is not that unambiguous. In October, Mr. Chin posed the question. As you noted, the record suggests that in November, Mr. Harder basically signed the promotion recommendation that had already been in the works since perhaps February of that year. But then in December, there's this email exchange between Mr. Harder and Ms. Kurtz, it's actually quite clear, this is at page 131 of the record, that he is a joint decision-maker on this. It is not just Ms. Kurtz's decision. She asked him what goals were set for Mr. Chin and did he meet them, and Mr. Harder says he did, but let's delay anyway. I think a jury could find that he wouldn't have done that had Mr. Chin not engaged in the opposition conduct, and perhaps that not signing the promotion form in November would have been too obvious, or he had a change within that time. I don't think it precludes, the fact that he signed the promotion precludes the jury from finding that retaliation is what was going on here, especially when viewed in the larger context of everything else that happened. You know, there's a lot going on in this case, and there's a strong story of retaliation and discrimination, and I don't think that the thing should be sort of viewed in isolation. Is there any evidence that Falco told Harder about, there's evidence that she told Stamowitz, whatever his name is, but I thought she actually denied at 990 and 996 that she ever told, that Falco told Harder that he had made this inquiry. Do you have an appendix reference that would tell me that he did, that she did? No, that's not something that I'm relying on, her telling him about the December conversation. This is, I'm referring to the conversation between Mr. Harder and Ms. Kurtz, who were the joint decision makers in delaying the promotion. Okay, all right. Of the two theories that you're relying on, obviously not harassment, but rather discrimination or retaliation, do you think one presents a stronger case for jury than the other? As I just said, I think that there's a lot going on in this case, and I think there's evidence, strong evidence of both. Clearly, Mr. Chin was on his way to promotion. He engaged in this protected activity, and around the same time, he received a comment that seems to have, at least a jury could find, been motivated by discrimination. I'm not sure it's necessary to untangle exactly what was motivating Vertex in eventually firing Mr. Chin, but I think both of are strong and should go to a jury. If I may just point the court to one point regarding Mr. Hart's comments about cultural differences, because Vertex spends a lot of time saying it's undisputed that that referred to the culture at Vertex. At 6.56, Mr. Hart explains his comments and actually, again, references Mr. Chin's cultural background and how he grew up and how that affects him fitting in at Vertex. I think Mr. Hart, even himself, doubled down on the idea that this is a reference to his Chinese national origin. Thank you. Judge Rendell, do you have any other questions for counsel? I don't. Thank you. Judge Ambrose? No, I do not. Thank you. All right. Thank you, Mr. Simmons. Your Honor, as opposing counsel, good morning. May it please the court. My name is William Simmons. I am from Littler Mendelsohn PC, and I have the privilege of arguing on behalf of a pele defendant, the employer in this case, Vertex Inc. Your Honor, the opinion of the district court should be heard. Can we start at the facts released in 2018? In February of 2018, Rick Harder emails Ed Reed saying he had spoken to Mr. Chin about a potential promotion at the end of the year and that he was fully engaged and that his current assignments certainly reflect senior level workload. That's a quote. Mr. Reed drafts a recommendation to promote Mr. Chin in October of 2018, stating that Chin has continued to improve himself and adds a tremendous amount of value to the organization, and Vertex is facing a business need for work at the senior enterprise level. So that's all looking pretty good, and the annual review process begins in November, and nothing seems to be a problem. December 13, the meeting takes place for the reporting process, and I guess there's four reports that came in by what, November 26? Is that correct? Yes, Your Honor. And three of them were positive, and one of Mr. Hart was not so positive. Is that correct? Your Honor, I don't quite agree with that characterization. I think Norm Stahl, however, testified that one of the things he looked at when he looked at the reviews was a comment by Mr. Hart himself about Mr. Chin's characterizing everything as positive. I take it that usually meets expectations is considered to be negative. Is that correct? Yes, Your Honor. Okay. Is Mr. Hart someone who worked with Mr. Chin closely? Actually, no, Your Honor. Mr. Chin solicited Mr. Hart for the review, and Mr. Chin described that the reason for soliciting Mr. Hart is that he, Mr. Chin felt strongly that his submissions to the idea box for Vertex called Bright Ideas were important, and Mr. Hart was in charge of the transformation zone at Vertex, so Mr. Chin solicited him, thinking that because he had submitted so many ideas to the idea box that Mr. Hart would give him a positive review, even though Mr. Chin actually, on the record, admitted that nobody had told him that part of his job was submitting ideas to the Bright Ideas box, and later admitted that those ideas were not adopted, and also later admitted that some of those ideas still included the PAM library idea that Vertex had told him to stop working on in 2017. So Mr. Hart did not supervise Mr. Chin or work with him, is that correct? Correct. So the other three reviews recommend at least the next steps be taken for career progression, is that correct? Your Honor, are you referring to a particular statement in the review? I'm not sure that they recommended it. I thought that none of the, I mean, the November 26th was the deadline for the reports to come in. Of the other three reviews that came in, did any of them say we should not take the next step for career progression? No, none said that there shouldn't be another step for career progression. I don't know that any of those reviewers were aware or not of whether there was any promotion request, so I don't think we can take those reviews as expressing an opinion on... The whole idea of what happened in November is would he be promoted to a senior enterprise level of architecture, is that correct? No, Your Honor, I disagree with that. This is part of Vertex's normal promotional review cycle, so those reviews that folks were giving was part of the normal review process, and Mr. Chin himself selected those individuals to review him. There was no special purpose of that review to determine whether Mr. Chin would be promoted. So, in other words, the two processes were independently ongoing at the time. Ultimately... Are you saying, counsel, that the document in which Mr. Hart's comments were embodied were part of this sort of the annual evaluation of performance? Correct. And that was promotion decisions that we are concerned about? Correct, Your Honor. I mean, there's no indication in the record, nor do I think it to be the case that any of these reviewers would know the current status of Mr. Chin requesting a promotion or not. These are co-workers that Mr. Chin self-solicited, and they're not given that sort of information. And who were the other two? Who were the persons authoring the other two reviews that were submitted by November 26th? Kurtz, Reed, and Hillman, according to 955. Kurtz, Reed, Hillman, Hart. And the only one that looked like negative in terms of those four was Kurtz. Is that correct? You mean Hart? Well, Kurtz is the one who asked the question on December 13th. So, I'm asking about her as well, Jen Kurtz. So, Your Honor, I think a couple things. Again, no, and again, Norm Stahlheber testified during his deposition explaining what his decision-making process was later on with the PIP when he was asked about the reviews. The fact that Mr. Hart indicated that Chin's engagement sometimes lacks follow-up, that the challenge for the coming rating period is he has to become more fully aligned with sponsored projects. He viewed as one of the core reasons that ultimately the calibration team concurred that Mr. Chin was not fully engaged in actual strategic initiatives of Vertex. And then also, there are questions here in the question legend, which is at record 0954, that talk about how frequently would you want Mr. Chin on the team? How frequently does this person achieve results for the winning way? So, if you look at question two, you have sometimes, often, not all, almost always responses. And you also have how frequently does this person surpass expectations for their role on this team or project? Question four, you have rarely or sometimes as the responses. So, it's not like this entire review was completely glowing except for Mr. Hart's comments. Isn't one of the reviewers saying that they praised Mr. Chin's, quote, exceptional talent, close quote? I'd have to look through the reviews, but I'll trust your honor that that's a direct quote from one of the reviewers. Your honor, I don't think that Mr. Chin. Hillman says that. Hillman says that. I don't think that Mr. Chin's overall talent is necessarily a question. The point was that he continued to work on projects like the Pan Library that he deemed to be super successful and incredibly valuable projects for Vertex, despite being told repeatedly that actually Vertex had disagreed and determined it was not commercially viable. So, I don't think anybody, so I know nobody at Vertex had a problem with Mr. Chin personally. Nobody had a problem thinking that he might have talent or intellect. The problem was where he was directing that talent, and that was the whole point of the performance improvement plan, that they allowed Mr. Chin to largely set the goals on himself to try to actually get him engaged in meaningful initiatives, just like Judge Schwartz had detailed the numerous times that people have brought up over the course of Mr. Chin's career. Why is that not for a jury to decide, though? All of this, you know, where there's smoke, there's fire, etc. Why should a jury not have to weigh all of these factors that we've been probing? Your honors, I think the district court properly and with the support of the law of this circuit, which the EEOC has indicated it's not seeking to change in this circuit as part of their involvement in the appeal, pointed out that there's fundamental legal deficiencies as to each claim. So, part of the role of the court and the reason that summary judgment exists respectfully is to determine that there's actually evidence-based links on which a reasonable jury could actually rely, rather than just that where there's smoke, there's fire theory of liability. Let's look at more than smoke and fire, but we will look at the evidence. As we've discussed, how is it that a jury should not decide the following in light of the fact we have to review the facts in plaintiff's favor? And what does the record show? The record shows that Mr. Hart's comment led Mr. Harter to revisit his evaluation of the plaintiff, downgrade it, and delay the promotion. We have evidence that Mr. Hart described his comment about passivity and explained his comments about cultural differences to Mr. Chin as indicating to Mr. Chin he should reflect upon his own education, career experiences, cultural background, where he grew up. And then finally, the jury has a pick that was impossible, viewing the facts in the plaintiff's favor, for Mr. Chin to ever successfully succeed because there wasn't a decision maker who could give him the task that the PIP identified he needed to perform. Apropos of what Judge Rondell just asked, you shouldn't a jury decide whether those facts are sufficient to demonstrate the lack of promotion and the termination were due to his ethnicity rather than his lack of engagement, his lack to contribute to concrete accomplishments that the entity could use. Sure. So I'll have to break down several of those if the court will allow it. Of course. Yep. So first, I think we need to separate out the retaliation claim and the discrimination. My comment, only we're going to discrimination if that helps you. All right. Thank you. Okay. So if you look at the discrimination claim, there's no evidence that any of the decision makers had any bias or any previous mistreatment or current mistreatment of Mr. Chin as a result of his race. We went through Mr. Chin at his deposition and asked for each one. Have they ever mistreated you in any way? Have they ever made any comments at all with respect to your race, even in any tangential way? And Mr. Chin couldn't point to any evidence of that. So that leaves only Mr. Hart's review as the only potential link of race to a decision here, except for that Mr. Hart wasn't a decision maker at all. Those comments were removed from the review at the request of Mr. Chin. The record shows without dispute, the reason those comments were removed is not because it was concluded that Mr. Hart was discriminatory or actually acting on stereotypes at the time that he made the comments, but that actually he was able to tell HR the reasons why he felt that Mr. Chin acted the way he described in the review based on specific experiences with Mr. Chin, who he characterized as a friend. But what you're saying are arguments to a jury. We clearly have Hart's statement. We clearly have a resulting turnabout putting this man on a tip out of the blue, basically. I mean, have explanations by the company, but those explanations are arguments to the jury. They're to look at the evidence in the light most favorable to Chin. Those are good arguments to a jury, but they don't undercut the fact that this happened. Then as a result, this horrible tip came about after the man's been there for 20 years and all of a sudden he's been put on a short leash. What caused that? Gee, I don't know, but the jury needs to decide that. But Your Honor, I respectfully disagree because there has to be a link between the decision made and that the decision makers acted because of Mr. Chin's race. Even let's just assume for the sake of argument, for the sake of this argument, that Mr. Hart was discriminatory. He was bigoted despite knowing Mr. Chin for years, despite that Mr. Chin self-solicited him for a review because of their relationship. Even if that's the case, there's no indication that the decision makers themselves took race into account or into view in making any of the relevant decisions, including the performance improvement plan, including whether he met the terms of the performance improvement plan, including the review. All of them testified without disputing evidence to contradict their rationale about the reasons for that decision. We produced tens of thousands of pages of documents, nothing to contradict those reasons for the decision. So I disagree that it's something that a jury needs to decide on that point. A jury may not believe that. A jury may not believe them. Well, that would go for any case, Your Honor. I understand what you're saying, Your Honor, but that could go for any case. I mean, any case we could say, well, all the decisions lined up perfectly with the reasons for their decisions, but a jury could just decide they don't believe any of them and think they're all making it up at the standard that historically this court has held ever since Fontes. There actually has to be evidence from which a jury draws that conclusion, and not just from an overall timeline and that he was employed for a long time and then he was terminated, especially where here there's undisputed record evidence that Mr. Chin admits that there was actually a sea change in the way things were on concrete results. So that perfectly aligns with exactly what the decision makers are saying was their reason. And so the standard can't be respectfully on pretext that a jury has to decide and that the basis for that is that the jury could just, again, without pointing to anything in the paper or record of the evidence or any contrary testimony or even statements of a co-worker that one of the decision makers told them something different, that they could just have that here, though. I think that's your challenge. I don't think Judge Rendell was communicating that this is a blanket statement, but rather the facts that you need to confront if we just hone in on just two of them is the Hart comment, which had an impact on a decision maker that was adverse to the plaintiff, and second, a PIF that was impossible for him to achieve. And there's nothing in the record that disputes that. So I think that that's what we're trying to get you to help us understand is did the district court err by ignoring those points? I don't think so, Your Honor, and I don't think it was ignored. There's no... They allowed Mr. Chin to develop this performance improvement plan himself. There were barriers that Mr. Chin listed as these are potential barriers and here's how I'm going to get around it. Mr. Chin never said at the time to any of the decision makers as he was working on this plan that actually there is no plan which I could ever accomplish here during this period. He worked on a plan, accomplished goals. The only one goal was not included in the final plan, and Mr. Stahlheber again has undisputed record testimony about the reason for that, which is that that goal that Mr. Chin laid out was defunded by Vertex at the time with respect to the enterprise objectives. So we disagree that there's no contrary record evidence that Mr. Chin could never accomplish this plan. He worked on it for over a month to come up with the goals that he thought he made sense with Mr. Stahlheber, who again, Mr. Stahlheber had no reason and there's nothing in the evidence to reflect that he was relying upon race in working with Mr. Chin on this plan or had any knowledge of any of the previous complaints about discrimination as have been characterized by the court. So again, you have Mr. Hart, typically this court and others as well as the Supreme Court have disregarded what are considered stray remarks by non-decision makers where even again, even if we consider Mr. Hart's review as biased in some way or stereotypical, which we refute, of course, that would typically be deemed- Can you really say something that's in it, Counsel Wait? Those stray remarks cases are not like this as it relates to the Hart comment, because the Hart comment was in an evaluation and then it was explained, he gave an explanation what he meant. So I don't know if you can really make an analogy. I will grant you that maybe on the other stray remarks that Mr. Chin claims were made, maybe that falls into that Taraski-Fortwood bucket. But I don't know that you can really say something that's in an evaluation of a stray remark of the sort that the court was talking about. But if I may, Your Honor, the things that Mr. Chin challenged as stereotypical are not the things that go towards eventually the reason why everybody on the calibration team says that they made the to Mr. Chin. So whether Mr. Chin's overall passive or not, or the things that he considered to be stereotypical Chinese, weren't the reasons ultimately for the review. It'd be different if Mr. Hart was directly supervising Mr. Chin and said, hey, I don't think he's fully engaged in my projects. And the reason I think he's not fully engaged in my projects is because he's, insert whatever is characterized as stereotypical generalizations of Chinese. That's not the case. I mean, basically, Ms. Falco testified again without rebuttal, that the reason that Mr. Hart's comments were removed is that he wasn't actually directly working with Mr. Chin at all. So it had no bearing on the ultimate reason that Ms. Kurtz far back in December 2018 had pushed back on the promotion in the first place, which is the lack of strategic involvement in strategic projects. Taking a step back, you are in a case before, let's say if this were to go before a jury, the thing that looks like a person is getting positive reviews through 2018, people are in his corner. As in October of 2018, Mr. Reid writes that there's a business need at the senior enterprise level of architecture. That'd be the next level up that will be persistent in Vertex's future. And then Mr. Reid and Mr. Harter in November are all for a promotion. You've got four reports to come in in November. Ms. Kurtz and Mr. Reid recommend, as I understand from the record, the next steps for involvement in promotion, because they knew about the promotion possibilities. Mr. Hellman praised the exceptional talent of Mr. Chin, and that's at the appendix at 955. And then you have to ask yourself, what meaningful change in Chin's professional performance occurred so he went from being suggested for promotion to a pimp and then terminated within a few months? Your blink response is, it doesn't make any sense. We've got to get to the bottom of this. That's what juries are for. Your Honor, I think the key thing missing in the record is the business transformation at Vertex. The Advantage Vertex model allowed Mr. Chin to basically solicit his own supervisor and Mr. Reid, who the record demonstrates had no direct involvement with his work. It allowed him to work on exploratory projects like the PAM library for six years that eventually, in 2017, shortly before all this, it was decided was not commercially viable at all at Vertex. The key change is the C-shift that even Ms. Kurtz mentions in her email to Mr. Harder when they're discussing the promotion. You'll see that she uses the terminology, in this new world order, justification is necessary. It's not that there's... I'm sorry. You go ahead and finish up and then I'll ask my question. The other thing I want to point out is you also have Mr. Harder, who's white, who's the supervisor of Mr. Chin, getting also usually meets during this review cycle. Everything adds up. You have, yes, the supervisor who's going along with a promotion request. Mr. Bryson even indicated, well, it seems like Mr. Harder was always in Mr. Chin's favor but it never really resulted in a promotion. You have this C-change at Vertex in which the focus is on business initiatives and actually accomplishing goals and not just brainstorming. The calibration team's whole focus and whole point, and there's no record evidence to dispute this, is that when you come to this cycle, given the new focus areas of Vertex, they're looking at Mr. Chin saying, well, it's great that he's a nice guy and it's great that over five years ago, even by Mr. Chin's admission, he had key accomplishments for the company, but he hasn't actually been involved in any strategic initiatives lately. And Mr. Harder testifies, again, without dispute, that during this process, he then agreed with the calibration team because he couldn't point to any strategic initiatives that Mr. Chin was actually involved in. So the whole point of the calibration team is to say, sure, your manager may say X. Your sponsor who you self-selected who has nothing to do with your day-to-day work may say X, but we need to ensure equity and uniformity consistent with Vertex's business initiatives. And that's exactly what happens to Mr. Chin. It's exactly what happens to Mr. Harder. And Mr. Chin hasn't introduced any other evidence of other employees who weren't performing well and who the calibration team or otherwise decided to support. The only person he points to there is Mr. Yahweh, but Mr. Yahweh is actually working in a key strategic initiative and was hired for that initiative, the cloud initiative, that was a key focus area of Vertex. And the last thing I'll say, your honor. When he was fired on what, May 16th, was that correct, 2019? Yes. And what was the reason given for his being fired at that time? He didn't complete the performance improvement plan goals of being engaged in a strategic initiative. And was that PIP capable of being completed by anybody in light of the change of company plans with respect to the projects that they were going to emphasize? Sure, your honor. I mean, all the other, there's no evidence in the record and plaintiff had ample opportunity to develop it that any of the other software architects were encountering this difficulty in being engaged or fully engaged in projects. There's no record evidence of any other software engineer during that time period, not having any work to do, not being able to be engaged in strategic initiatives. So they had the ability to develop that. Is there any evidence to show that he is incorrect when he says there was no decision maker available to approve the, to allow me to join these particular projects or identified in the PIP? Because that's the only point, I only recall that being, that was the state of the evidence. There was no reputation that he could have gone elsewhere. Your honor, the, I'm going to, I'm going to add onto that. Didn't Mr. Chin say he repeatedly asked to join the strategic initiatives in his PIP and never got a response? I'm not sure what you're referring to, your honor, so. My recollection is like Judge Ambrose that there were either he couldn't find a decision maker to let him on the team or he didn't get a response to his inquiries to join a team or do a project, however you want to phrase what he's trying to accomplish. The record just suggests that there was, there were goals set forth in the, in the plan. His explanation is I couldn't accomplish them because the decision makers were either not authorized because of the change in management structure, not available, non-responsive. And so he failed even after the grantees or company gave him the extension. I think that's what Judge Ambrose is driving at. Let me just ask the judge before I completely agree. Yeah. So your honors, I think the fundamental point is what would Mr. Chin have been doing absent the performance improvement plan? He was given the opportunity to work on this plan himself and set goals. So if the whole point of Mr. Chin is that this whole thing was an artifice, he really was engaged in strategic initiatives, where was that in the plan? So he, if the whole thing is that he couldn't get engaged in strategic initiatives because it, either it's because it's impossible or it's because this was all an artifice and he really was engaged in strategic initiatives. So he can't have it both ways. If he was really engaged in strategic initiatives, it should be pretty easy to continue those initiatives and accomplish this plan. If he wasn't engaged in strategic initiatives, that's exactly the whole basis for the calibration team saying that business has changed. It's not a case for both ways. He's repeatedly asked to become involved in strategic initiatives and never got a response. But there's no indication. That's not going to be helpful to you if this were to go to trial. Well, there's no indication that any of those decision makers, again, for the retaliation claim knew about any of his complaints for the discrimination claim had any bias whatsoever. So the point of them not responding is a direct reflection of Mr. Chin's lack of engagement in their previous strategic initiatives. There's no indication that any of that was done for a discriminatory basis. How many employees are there at Vertex? I think a little over a thousand, your honor, but I'm not sure if it's in the record so I don't want to say for sure. Okay. I was just going to say that the, I think this, you know, but for the calibration result review, you know, we wouldn't be here, but we have the calibration result review in which Hart makes the conclusion that he doesn't take ownership and establish relationships within the zone to win model. That is a conclusion he has drawn from all the, his behavioral pattern as not being consistent with the winning way. And it's based entirely on cultural, but for that, and I guess if you could show that no one else knew of that, you drew a distinction between, well, if there's somebody who's a supervisor, but this is the way the calibration process is set up to be. It's to be the supervisor or reviewing body to determine what happens with an employee. So I don't draw the distinction between, well, was it a supervisor? This is the team. And what comes out of that team is his behavioral patterns and the way he, you know, comports himself is not consistent with the winning way. It's not, he didn't involve himself in strategic project. It's his behavioral pattern. So, you know, I think you're, you're, you're not looking at that as carefully as I think you need to. And as I think a jury would, and you can make all the explanations you want about the post hoc statements by the other employees who, of course, you know, I mean, they're, they're, they're going to look at it a little differently perhaps. But you've got to, you know, it's like a, a pretty strong piece of evidence there that, that I think you're, you're just not valuing enough, if you will. That's a good question. Your Honor, may I address that? Sure. First of all, in terms of the characterization that Mr. Chin makes of some of these people made statements having post hoc justifications, I think actually that works in our favor at this point. I mean, Mrs. Kurtz hadn't been employed for four years or three years at Vertex at the time she signed her statement about why she made the decisions that she made in the calibration team. She would have no reason to lie at that point. Okay, but that's, again, that's an argument to the jury. No, what I'm saying is that there's also no contrary evidence to disbelieve her and the rationale for the decision. And in December 2018, when she pushes back on the promotion, there's no indication that she's relying on Mr. Hart's comments. The calibration meetings don't start until January. There's no indication in the record evidence that she's looked at Mr. Chin's review. She's formulating that based on her own knowledge of Mr. Chin not being involved in strategic initiatives. Another member of the calibration team, Norm Stahlheber, also comments that he was well aware from his role at Vertex that he was not involved in strategic initiatives. So, in other words, the record evidence actually shows by all the decision makers where they're saying, yes, Mr. Chin self solicited Mr. Hart for a review. Mr. Hart, we all know, wasn't actually working directly with Mr. Chin on any projects. Ms. Falco removes those comments and she describes why because she says it's inappropriate for her to he's not actually directly working with him on actual projects, but that the calibration team's decision stands because he's not engaged in strategic initiatives and the PIP is set up for him to do so. But that review was out there from February 8th till May 1st. February, March, April. Right. Correct, Your Honor. And during all that time, Mr. Chin is not objecting to it as a basis for the performance improvement plan he's working in. At the same time, Mr. Chin is not saying that he's working on a performance improvement plan that can't be accomplished or that he'll never be involved in strategic initiatives. Okay. I have a couple more questions. One, why was Richard Yao's rating changed when he appealed his review, but Mr. Chin's rating wasn't changed even after Hart's review was removed? Yeah, so multiple decision makers testified. Ms. Falco testified at deposition about this. Ms. Kurtz testified about Mr. Yao. There wasn't an appeal of Mr. Yao's review. The record reflects that during the calibration process, just like Mr. Chin, Mr. Harter had originally rated Mr. Yao as usually meets. And the calibration team, just like it did with Mr. Chin, disagreed with that rating. And it was because they further investigated and determined from the people that were actually working with Mr. Yao that he was engaged in the projects as they needed to be. So again, and then after that, the calibration team rates Mr. Harter and needs improvement. So this all aligns with the fact that Mr. Harter is making certain recommendations, but the calibration team is overruling him based on their knowledge of the facts. And in Mr. Chin's case, it's their knowledge of the facts that he's not engaged in any strategic initiatives. And Mr. Yao, it's based on their knowledge that he actually is engaged in the cloud initiative, which is the thing he was only recently hired for and was an actual key strategic initiative of Vertex. Chin says he was not allowed to appeal to human resources. When he was informed of the decision, they told him that the rating wouldn't change. So I think this whole terminology of an appeal is a misstatement of actually what happened. So with respect to Mr. Yao and Mr. Chin, both had certain recommended ratings by their manager, Mr. Harter. Both were changed during the calibration process. My final question relates to the December of 2018 meetings. I'm going to refer to the December 14, Kurtz, this was an email, emails Harter expressing skepticism about the recommendations to propel Chin. Harter writes back agreeing to postpone the decision, even though Chin has quote, accomplished the goals that Ed getting agreed. And I set for him earlier in the year because Harter was, he was starting to feel uncomfortable about some of the issues, for an minor as they are, so they are those friends that have showed up in the review were those minor issues, would it possibly be Hart's comment? I think that would require speculation, your honor. Then does that then require evidence placed to a jury as to what that speculation should be? Instead of speculation, what are the facts should be? I don't think so, your honor, because again, this chain of events starts with Ms. Kurtz pushing back on Mr. Harter. There's no evidence in the record that Mr. Harter comes forward to Ms. Kurtz and says, hey, I've changed my mind about my promotion request for the review. Ms. Kurtz is pushing back what exactly has he accomplished in terms of our strategic initiatives. We've got this new world order. We need justification for things like this. So again, I think the, again, the uncontradicted record evidence is that Mr. Hart's review itself in terms of his comments about Mr. Chin's personality, there's no record evidence that anybody relied on Mr. Chin's personality to make a decision in this case. Each of them testified that with their own independent knowledge, they knew that he was not working on strategic initiatives and with the shift his own to win, that was now the focus of Vertex and the performance improvement plan was designed. Again, he got to work directly with Norm Stahlheber on his- But couldn't the jury infer from that email that Judge Ambrose just read to you that the words that Mr. Hart used in the review, considering the timeline that's been painted in the record that evaluations are being created, there was pause by, as a result of a conversation between Kurtz and Harter about what was in quote the review. The only review we have in the record is the one in 954-55, which we've discussed. So isn't there enough for a jury to infer that that reference that Judge Ambrose drew your attention to was to Mr. Hart's comments and Mr. Reed's comments? Because Mr. Reed also makes a comment that talks about what you're talking about, which is lack of contribution to strategic projects. Right. I think it would be everything in the review, as we mentioned, there's also questions that I went through previously that weren't entirely favorable to Mr. Chin. But the point is that, is it fair to infer that the review that Mr. Kurtz and Mr. Harter were discussing is the review in the 950s that we've identified with those questions? I don't think so, Your Honor. But even if that were the case, so even if the court wanted to assume without deciding or were to decide that a jury could infer that Mr. Harter at that point looked at Mr. Hart's review and started to have concerns, there's no indication, again, let's separate into discrimination and retaliation, that Mr. Harter at that time was relying in any way upon race or cultural differences to make that determination. In terms of retaliation, it's a long time until Mr. Chin actually complains that that's in any way discriminatory. So, again, the record evidence is about what the decision makers actually decided and relied upon ultimately to make these determinations. And there's also no record evidence, and again, plaintiff had ample opportunity to develop it, that email exchange itself undid Mr. Chin's promotion or that it would have been automatically granted if Mr. Harter had pushed forward, because Ms. Kurtz is already pushing back at that point. Okay, thank you. Let me ask Judge Rundell, do you have any further questions of counsel? No, thank you. Judge Ambrose? No. Okay. All right, counsel, we thank you for your arguments, and we'll hear from Plaintiff's counsel on rebuttal. Thank you, Your Honors. Sorry, I was muted. The Georgia Pacific Court case stated, it's a Third Circuit case. Discriminatory statements constitute direct evidence of discrimination where there's evidence linking the speaker to the employer's adverse employment action. In this case, we have Mr. Harter's admitted review based on cultural differences. We have Mr. Harter who testified that he used Mr. Harter's review in the rating decision. We then have the admission by Ms. Kurtz that the poor rating, which is based on Mr. Harter's review, led to the denial of Mr. Chin's promotion. We also have the poor rating based on Mr. Harter's discriminatory statements caused the PIP. The PIP was fake. Mr. Chin was engaged in the excise tax project. The defense completely ignored that point. The fourth item was removed because Mr. Chin was engaged in the excise tax project. Mr. Chin was deemed to have failed the PIP, and the failed PIP led to his termination. So we have direct- If I could just focus you back on the PIP. Your colleague across the aisle suggested that the PIP goals were set by Mr. Chin. Yes. And the way they're viewed is that he did. Yes. How is it that you can blame the defendant for failure if your client identified the very projects he should try to get to participate in? Yes. Thank you. Okay. Vertex did not identify at the time a single performance issue on the part of Mr. Chin that he needed to improve upon. Rather, they said, you do it. You figure it out. You figure out what the performance issues are. Is that really fair that they didn't identify anything? Wasn't the problem, from their point of view, to be very concrete? Is that he worked on projects that he believed were good ideas, and they did not view as being concrete, strategic, to the advantage of, in a monetizable way, the company? So I don't think you can say they didn't identify any problem. And in fact, his PIP indicates he's going to try to look for projects that have strategic advantage. And he was engaged in one of them, the excise tax project, and they ignored that fact. But they also didn't concretely identify what exactly was the performance issue that he needed to improve upon. They say, they said after the fact, a year later, or two years later, that he was not engaged. But that phrase comes from a comment at the top of the performance evaluation that it says, his engagement sometimes lacks follow-up, and will need to supplement his current workload for the, you know, into the future. Essentially, what they're saying is, this is, this is sort of looking forward, what he can do to be better. It's not looking backwards, saying he's not engaged. It's saying, in the future, you know, these are some things that, you know, Mr. Chin could improve upon. But that's common with any performance evaluation. It wasn't an evaluation of his past lack of engagement. It was more, you know, going forward, let's get him engaged in some more projects. And then, VRTSAC seizes upon that post hoc and makes it look like he's not engaged. In fact, he is engaged in the excise tax project. Okay, thank you. Thank you. Just a question, maybe outside the record. What is Mr. Chin doing now? Mr. Chin is working on his own business. He's developed a tax software that he's in the process of marketing and attempting to sell. Okay, thank you. Judge Schwartz, if it's possible, I'd like to get a transcript of this oral argument, if we may. Sure, yeah, of course. We'll ask counsel to split the, for the parties to share the expense of a transcript. And we'd ask the clerk of court to arrange with counsel how to procure the transcript. Before we close, Judge Rendell, do you have any other questions of counsel before we end? I do not, thank you. Judge Ambrose? No. Thank you. All righty, counsel, the court will take the matter under advisement. We appreciate counsel's, for all participants, very helpful argument to enable us to resolve this matter. So we wish you all a good day. And next time, hopefully we'll see you in person. Thank you.